**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Raymond A. GUNDERSON, Defendant–Appellant.**

No. 94–3594.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1995.

Decided June 6, 1995.

Daniel P. Bach, Asst. U.S. Atty., Madison, WI (argued), for U.S.

Robert R. Henak, Dean A. Strang (argued), Shellow, Shellow & Glynn, Milwaukee, WI, for Raymond A. Gunderson.

Before POSNER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Raymond Gunderson (Gunderson), the secretary-treasurer of Gunderson Truck and Auto World (GTAW), appeals his sentence imposed pursuant to a guilty plea to one count of bankruptcy fraud, a violation of 18 U.S.C. § 152.[1] We affirm his sentence.

### Background

In May 1990, Bank One–Milwaukee and GTAW entered into a $7,000,000 "floor plan" agreement—a financing agreement—whereby Bank One would finance most of GTAW's car and small truck inventory. Under the floor plan, which both Gunderson and his brother Arthur (the president of GTAW) signed, GTAW pledged all of its inventory as collateral and agreed not to subject that inventory to other liens. GTAW did not live up to its side of the floor plan agreement; it used some of its inventory as collateral with another bank, First Bank La Crosse.

For reasons not directly relevant to this case, in January 1991, the FBI began investigating the financial practices of GTAW. Soon it discovered the double financing and informed Bank One and First Bank. Each bank conducted an audit of GTAW. Subsequently, Bank One placed on-site a representative to monitor Bank One's collateral, and First Bank stopped financing GTAW altogether. Gunderson admitted that the double financing was necessitated by financial problems.

On March 26, 1991, GTAW filed a voluntary bankruptcy petition under Chapter 11. GTAW, as debtor in possession, and Bank One, as the primary secured creditor, executed a cash collateral agreement (Agreement) on April 15. Gunderson signed the Agree-

---

1. The relevant portion of 18 U.S.C. § 152 states: Whoever knowingly and fraudulently conceals from the custodian, trustee, marshal, or other officer of the court charged with the control or custody of property or from creditors in any case under title 11, any property belonging to the estate of a debtor ... Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

ment as secretary-treasurer of GTAW and personally as guarantor.

The parties stipulated in the Agreement that GTAW owed Bank One over $7,000,000 from the floor plan agreement and from a shortfall on funds received from the sale of vehicles that GTAW had pledged as collateral to Bank One but for which GTAW had not turned over the proceeds from the sale. Under the Agreement, Bank One was granted a first priority security interest in all post-petition assets, excluding properly perfected purchase money security interests and real estate. Post-petition assets included all "vehicle inventory" and the proceeds from all "vehicle sales."

In order to allow GTAW to continue to operate, while also recognizing Bank One's interest in monitoring GTAW's business practices, the parties agreed that GTAW would deposit all proceeds from the sale of vehicles into its accounts at United Bank in Osseo, Wisconsin. GTAW was prohibited from using any proceeds from vehicle sales without the permission of Bank One, but was allowed, without Bank One's permission, to use the proceeds from its service and repair work for operating expenses in the ordinary course of business.

The Agreement was modified and finally approved by the bankruptcy court on October 8, 1991 and entered as its order. A little over a month later, it was apparent that GTAW could not work out of its financial woes, and on November 27, 1991, the bankruptcy court ordered that at 5:00 p.m. on December 20, 1991, all assets of GTAW were to be turned over for liquidation to Bank One.

To facilitate the described Agreement provision which allowed GTAW to use the proceeds from its service and repair work, but not the proceeds from vehicle sales, GTAW opened two accounts at United Bank: one was referred to as the "Inventory Account" and the other was referred to as the "Service and Repair Account."

In the late fall of 1991, while the approved Agreement was in effect, the Buffalo County, Wisconsin Highway Department contacted GTAW to supply it with two General Motors trucks for snow plowing. Gunderson asked Bank One to finance the deal for GTAW, but the bank declined. Because he could not obtain financing, Gunderson arranged with Iten Chevrolet, a nearby dealership, to order the trucks and have them "drop-shipped" at GTAW, who would then sell the trucks to Buffalo County. In turn, GTAW would reimburse Iten Chevrolet for the cost of the trucks.

In early December, GTAW received the trucks and delivered them to Buffalo County. Buffalo County paid GTAW $33,073.50 by check dated December 9, 1991. On December 16 that check for vehicle sales was deposited in—not the Inventory Account—but the Service and Repair Account. On that same day, Gunderson wrote two checks on the Service and Repair Account payable to Iten Chevrolet and placed them in the mail.

In the meantime, United Bank was aware of the bankruptcy court order that directed all assets of GTAW referred to in the Agreement be turned over to Bank One at 5:00 p.m., December 20 for liquidation. Gunderson was at United Bank on Friday, December 20 and learned that after 5:00 p.m. United Bank would not honor the two checks he had mailed to Iten Chevrolet. Acting before the 5:00 p.m. deadline, Gunderson cashed three checks drawn on the Service and Repair Account: one payable to United Bank in the amount of $37,000.00, one payable to Ray Gunderson in the amount of $1,639.50, and another payable to United Bank in the amount of $3,774.47. Gunderson received cash in the sum of $32,413.97 and two cashier's checks each in the sum of $5,000.00.

The following Monday, December 23, 1991, Gunderson delivered to Iten Chevrolet $33,-400.00, from the funds withdrawn on Friday, in payment for the two trucks.[2]

2. On December 26, 1991, United Bank returned the earlier Iten checks unpaid, as stamps on those checks reflect.

### Proceedings Below

A three count indictment charged Gunderson and his brother with two counts of bank fraud and one count of making false statements to a federally insured financial institution. Before trial, pursuant to a plea agreement, the government dismissed the indictment against Raymond Gunderson and entered into a separate pretrial diversion agreement with Arthur Gunderson. Raymond Gunderson in return pled guilty to bankruptcy fraud. Gunderson admits that his holding the $33,400 over the weekend, after the time that the bankruptcy judge had ordered that all GTAW assets be turned over to Bank One, violated 18 U.S.C. § 152.

At sentencing, Chief Judge Crabb determined Gunderson's total offense level as 12 under United States Sentencing Guideline (U.S.S.G.) § 2F1.1 and his Criminal History Category as I, resulting in a guidelines range of 10–16 months. Judge Crabb then imposed a sentence of 13 months imprisonment.

### Calculation of Loss Under § 2F1.1

Gunderson first argues that the district court erred in adjusting his offense level upward four levels. Under § 2F1.1, the Guidelines provision that governs "Offenses Involving Fraud or Deceit," the base offense level is 6. The court is then instructed to determine the amount of loss associated with the fraud and to adjust the offense level according to a chart provided. The district court concluded that the victim, Bank One, realized a loss of $33,400, the amount that Gunderson withheld from the bankruptcy estate after the December 20 deadline and paid to Iten Chevrolet on the 23rd. This calculation increased his offense level to 10. Gunderson claims that the district court erred as a matter of law in defining loss. As Gunderson claims that the district court erred in interpreting loss, we review the district court's factual findings for clear error, but review de novo the district court's interpretation of loss. *United States v. Strozier,* 981 F.2d 281, 283 (7th Cir.1992).

Loss is described in the commentary as "the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, Application Note 7. Gunderson contends that Bank One incurred no loss because Iten Chevrolet was entitled to the $33,400. He believes that we must delve into the Bankruptcy Code and Article 9 of the Uniform Commercial Code to determine loss under § 2F1.1. The government, on the other hand, urges us to take a simpler approach to the interpretation of loss. Because Gunderson admits that he violated the bankruptcy court's order by diverting from the estate the $33,400, $33,400 is the amount unlawfully taken, the government claims.

We need not choose between these approaches because even if Gunderson's approach is correct, he loses. Gunderson violated the court ordered Agreement by withdrawing the money received from the sale of the trucks, and therefore Bank One was deprived of the $33,400 to which it was legally entitled.

Paragraph 5 of the Agreement states, in part, "The Debtor hereby grants to [Bank One] a first priority security interest in *all post-petition assets,* . . . including *vehicle inventory.*" Paragraph 8 states:

> The Debtor has established bank accounts at the United Bank of Issue in Osseo, Wisconsin. The Debtor hereby agrees to deposit all of the proceeds of vehicle sales and all other receipts from the operation of its business or sale of fixed assets into these accounts. *The Debtor will not be authorized to make withdrawals or disbursements from the proceeds of vehicle or fixed asset sales without Bank approval.* The Debtor will be authorized to use the proceeds from service and repair work for operating expenses in the ordinary course of the Debtor's business. (Emphasis added).

The Agreement ordered by the court does not specifically contemplate separate bank accounts, but, as noted above, Gunderson assigned the labels of "Inventory Account" and "Service and Repair Account" to the two accounts. As evidenced by his testimony at the sentencing hearing, however, Gunderson did not deposit the proceeds of *all* vehicle sales in the "Inventory Account."

> Q   Now, if I came into the dealership and bought one of the cars not financed

through Bank One and whose serial number was not on the list, where did the proceeds from that sale to me go? Into what account?

A  After discussing it with Jerry Kuehl, it would go in our service account.

\*　　\*　　\*　　\*　　\*　　\*

Q  Is it your testimony, Mr. Gunderson, that Bank One did not have a security interest in vehicles acquired by your dealership after the bankruptcy petition was filed, unless those vehicles had been [financed] by Bank One.

A  That's correct.

Unfortunately for Gunderson, that's not correct. The unambiguous language of the Agreement as approved and ordered by the court gave to Bank One a first priority security interest in all vehicle inventory and the proceeds from all vehicle sales, whether or not Bank One financed GTAW's purchase of the vehicles. Further, the Agreement states that GTAW agreed to "deposit all of the proceeds of vehicle sales" into an account at United Bank. GTAW was not authorized to withdraw the proceeds from the sale of vehicles without permission from Bank One; this limitation held true regardless of into which bank account Gunderson deposited the proceeds from the sale of the trucks.

From Gunderson's testimony and the exhibits introduced at the sentencing hearing, it is clear that Gunderson deposited into the Service and Repair Account the money he received from Buffalo County, then withdrew from those same funds the money to pay Iten Chevrolet. Contrary to the court approved Agreement, he did not get Bank One's permission before making this withdrawal.[3] Bank One was entitled under the court approved Agreement to the $33,400 that Gunderson withdrew, held and ultimately paid to Iten Chevrolet. Therefore the district court did not err in finding that $33,400 represented the loss associated with Gunderson's fraud, as contemplated by U.S.S.G. § 2F1.1.

*Adjustment for Violation
of a Judicial Order*

■  Gunderson's second issue on appeal is whether the district court erred in adjusting his offense level upward two levels under § 2F1.1(b)(3)(B). That section states:

If the offense involved ... (B) violation of any judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines, increase by 2 levels.

The district court found that Gunderson had violated the Agreement, to which the bankruptcy court had given its imprimatur. Gunderson admits that his conduct falls within the purview of the language of the section. But he claims that the rationale for the adjustment does not apply to his situation and that use of the adjustment constitutes double counting.

Gunderson first claims that, although on its face the adjustment applies to his conduct, the adjustment was really meant to punish recidivist behavior. He looks to two portions of the commentary for support. Gunderson quotes Note 5, which states that "If it is established that an entity the defendant controlled was a party to the *prior* proceeding, and the defendant had knowledge of the *prior* decree or order, this provision applies even if the defendant was not a specifically named party in the *prior* case." (Emphases Gunderson's). The commentary then gives an example of a defendant who had been enjoined from selling a dangerous product, but flouts the injunction. Farther along, the commentary states "A defendant who has been subject to civil or administrative proceedings for the same or similar fraudulent conduct demonstrates aggravated criminal intent and is deserving of additional punishment for not conforming with the requirements of judicial process or orders issued by federal, state, or local administrative agen-

---

**3.**  The government proved by a preponderance of the evidence that Gunderson violated the Agreement by using the proceeds from vehicle sales. Gunderson testified to a vague "course of dealing" by which Jerry Kuehl, Bank One's on-site representative, controlled into which account funds from vehicle sales and other income would be deposited. This was insufficient, however, to show that on this specific occasion, Bank One gave Gunderson permission to withdraw the proceeds from the sale of the two trucks to Buffalo County.

cies." U.S.S.G. § 2F1.1, Commentary, Background.

From this Gunderson concludes that "it appears that the two-point enhancement at issue here is designed to apply when a defendant has had a previous warning." We agree. However, Gunderson had such warning: the Agreement, which received the bankruptcy court's approval and became its order. It is completely rational, and we believe wise, to determine that a person who defies a specific court-directed course of conduct shows a more "aggravated criminal intent" than one who violates the general laws against fraudulent conduct. Thus the rationale for the adjustment completely fits Gunderson's actions.

For these same reasons, no double counting problem exists with respect to § 2F1.1(b)(3)(B). This court recently resolved this exact question. *United States v. Mohammad*, 53 F.3d 1426, 1436–37 (7th Cir. 1995). *See also United States v. Michalek*, 54 F.3d 325, 331–32 (7th Cir.1995) (stating that "violations of 18 U.S.C. § 152, in their most basic form, involve a higher level of culpability, and thus deserve greater punishment, than some of the other crimes that correspond to Guideline § 2F1.1."). The violation of a judicially approved agreement is sufficiently more serious than some other crimes that fall within the scope of § 2F1.1 to warrant a stiffer penalty.

The sentence imposed by the district court is

AFFIRMED.