**UNITED STATES of America,
Appellee,**

v.

**James MANAS, Defendant,**

**John Fasano, Joseph Pignatiello,
Defendants–Appellants.**

**Docket No. 00–1006.**

United States Court of Appeals,
Second Circuit.

Argued May 25, 2001.

Decided Nov. 27, 2001.

Francisco E. Celedonio, New York, NY, for Defendant–Appellant Joseph Pignatiello.

Joshua L. Dratel, New York, N.Y. (Joshua L. Dratel, P.C., New York, NY; Martin J. Siegel, Marshal A. Mintz, New York, NY, of counsel), for Defendant–Appellant John Fasano.

Timothy J. Coleman, Assistant United States Attorney, New York, N.Y. (Richard M. Strassberg, James J. Benjamin, Jr., Assistant United States Attorneys, Mary Jo White, United States Attorney for the

Southern District of New York, New York, NY, of counsel), for Appellee United States of America.

Before: CARDAMONE, PARKER, Circuit Judges, and MURTHA *, District Judge.

CARDAMONE, Circuit Judge.

Defendants John Fasano and Joseph Pignatiello (defendants or appellants) appeal the judgments of conviction entered following a jury trial and sentences imposed on December 29, 1999 and February 8, 2000, respectively, in the United States District Court for the Southern District of New York (Sand, J.). Each was found guilty of one count of conspiracy to commit securities fraud, wire fraud, and commercial bribery, in violation of 18 U.S.C. § 371 (1994); one substantive count of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (1994); and one substantive count of commercial bribery, in violation of 18 U.S.C. § 1952(a)(3) (1994). In a separate summary order we affirm the judgments of conviction with respect to all of these counts. We also affirm the sentences imposed, and write to discuss one issue raised on appeal with respect to those sentences that questions whether the sentencing court properly calculated the loss resulting from defendants' criminal conduct under the United States Sentencing Guidelines Manual (U.S.S.G. or Sentencing Guidelines) § 2F1.1(b)(1) (1998).

■ Defendants' conduct came to light in a government sting operation. A "sting" is an elaborate confidence game worked by undercover police to catch criminals red-handed. The sting here was set up so that the intended victims of defendants' fraud never actually suffered an economic loss.

Yet, as we have previously ruled, the test for calculating a loss for sentencing purposes is whether defendants intended that others suffer a loss, regardless of the likelihood of success of their fraudulent scheme. *See United States v. Klisser*, 190 F.3d 34, 35–36 (2d Cir.1999), *cert. denied*, 529 U.S. 1112, 120 S.Ct. 2002, 146 L.Ed.2d 799 (2000).

When the government in a sting operation holds itself out as a thief in order to catch a thief, we need to assure ourselves that the government has not exceeded its lawful authority. Here, the defendants do not allege that the police conduct was unconstitutional or arbitrary or otherwise beyond the authority of the police. Indeed, nothing in the record suggests any police misbehavior. Rather, the defendants raise several sentencing issues on appeal, and we find one particularly troubling.

■ The government has conceded that the person who manipulated the stock price at defendants' behest—conduct for which defendants were charged—was not a participant in any criminal activity with regard to the stock. Because the government took this somewhat anomalous position, it opened the door for defendants to challenge their sentences on the ground that the sentencing court's consideration of the conduct of this unwitting individual in their conspiracy unfairly penalizes them insomuch as that person's conduct resulted in meaningfully heavier sentences for each of them. We agree that in some situations it would not be appropriate for a court to enhance a sentence because of the conduct of an unwitting individual. In the end, however, we are satisfied that the conduct in this case was both directed by the defendants and integral to their criminal

---

* Hon. J. Garvan Murtha, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

scheme. Hence, we affirm the loss calculation.

## BACKGROUND

### A. *The Conspiracy*

In light of the narrow issue to be resolved, our recitation of the facts will be brief. At trial the government sought to prove that defendants Fasano and Pignatiello engaged in a scheme to manipulate the stock of a publicly traded company called Spaceplex International Amusement Centers, Ltd. (Spaceplex). Its principal was James Manas, a named defendant, who entered a guilty plea pursuant to a cooperation agreement with the government. Spaceplex's primary asset was the Spaceplex indoor amusement center in St. James, Long Island, which boasted video games, a snack bar, a laser game, and rides. At all relevant times, Spaceplex common stock was a "penny stock" valued at less than $5 per share and traded on the OTC Bulletin Board, a securities quotation system operated by the National Association of Securities Dealers (NASD).

In the fall of 1995 Manas approached Fasano for help in "obtaining market support" for Spaceplex stock. Fasano introduced Manas to Pignatiello, a stock promoter. In a series of meetings and conversations conducted through early January 1996, the three men developed a strategy to raise the price of Spaceplex stock, which in December 1995 was trading at about $0.25 per share. This strategy called for a 30–for–1 reverse stock split that would reduce the number of shares available on the market, increase the price per share, and make it easier to control that price in the future. The scheme also called for the services of a market maker, defined by a federal statute to include as "any dealer who, with respect to a security, holds himself out [in the interdealer market] as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a)(38) (1994); *see SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1469 (2d Cir.1996).

It was envisioned that the market maker would manipulate the price of the stock by placing bids and making numerous trades that would give the appearance that the stock had an active market. The three men further planned to enlist the services of a broker who would sell Spaceplex shares to investors in a private placement once the price had risen to $3 per share, as a means of solidifying the stock price and of generating profits for themselves. When the stock price had grown sufficiently high, ideally $8 to $10 per share, they hoped to launch a secondary public offering to generate further profits.

Pignatiello enlisted Peter Mazzeo to act as market maker. Mazzeo is a stock trader in Jericho, Long Island who, in Pignatiello's words, was willing to "do whatever we need done" but "[d]oesn't want to know anything." Thereafter, acting on Pignatiello's directions, Mazzeo posted a bid of $2.50 per share for Spaceplex stock at 1:56 p.m. on January 5, 1996. That quote represented a new high bid and raised the market price for the stock from its opening high bid of $2 the previous day. Over the next several weeks, Pignatiello asked Mazzeo's firm to enter the high opening bid for Spaceplex stock in 42 out of 64 consecutive trading days. In following Pignatiello's instructions, Mazzeo by the end of February 1996 had accumulated 7000 shares of Spaceplex stock, which he held in several nominee accounts under Pignatiello's control in anticipation of later sales.

Pignatiello also solicited and secured the brokerage services of an individual who in fact was an undercover FBI agent posing as a corrupt stock broker through a fic-

tional firm with an office in Manhattan. Pignatiello explained to the government agent his plans to raise the price of Spaceplex stock, secured the agent's agreement to participate in return for a share of the profits, and introduced the agent to Fasano and Manas as his partners in the scheme. On January 17, 1996 Fasano hand delivered to the agent a certificate for 40,000 shares of Spaceplex stock that the agent was to sell to his fictitious brokerage customers, and Pignatiello also instructed the agent to arrange a sale to his customers of the 7000 shares that Mazzeo had accumulated.

Fortunately, out of concern for the danger of loss to innocent investors, the undercover agent's superiors at the FBI instructed him not to sell Spaceplex shares. Instead, he was told to complain that the certificate bore a restrictive legend preventing sale of the stock, that he was subject to an NASD examination, and later that he had already committed his available funds to another transaction. As a result of the agent's ruses, Fasano and Pignatiello arranged for the sale of Spaceplex stock through another company, and in March 1996 Manas caused Spaceplex to issue 129,404 additional shares to compensate the two of them (as well as Fasano's partner) for their services.

### B. *Prior Proceedings*

On April 3, 1997 Pignatiello, Fasano, and Manas were indicted in the Southern District of New York on one count of conspiracy to commit securities fraud, wire fraud, and commercial bribery, as well as separate substantive counts of wire fraud and commercial bribery. As noted, Manas entered a guilty plea. Fasano and Pignatiello were tried as co-defendants by a jury before district court Judge Leonard B. Sand from late June to July 15, 1999. The government contended at trial that these two defendants had conspired with Manas to defraud the agent's fictitious customers of the value of an honest broker's services by agreeing to pay the agent a kickback in exchange for his sale of Spaceplex stock to such customers at an artificially inflated price. The government presented, among other evidence, taped recordings of numerous conversations involving the co-defendants and the testimony of the undercover agent and defendant Manas. Neither Fasano nor Pignatiello presented any evidence. The jury convicted both of them on all three counts on July 15, 1999.

On December 29, 1999 and February 8, 2000, the district court sentenced Fasano and Pignatiello to 37 months and 71 months of imprisonment, respectively. In calculating each sentence, the district court imposed an 11–level increase in the base offense level in light of its estimation that the loss from defendants' criminal conduct was $900,000, pursuant to U.S.S.G. § 2F1.1(b)(1)(L). The sentencing court arrived at this figure by multiplying the number of shares of Spaceplex stock implicated in the scheme (300,000) by the intended increase in the price per share (from $2 in January 1996 to $5, for a total increase of $3), as recommended by the presentence report for each defendant.

Pignatiello objected to the determination that $2 per share was the appropriate bottom limit for measuring the intended increase. He reasoned that because the increase from $2 to $3 per share was due solely to Mazzeo's conduct, and because the undercover agent was to start selling shares to innocent customers only when Mazzeo had raised the price to $3 per share, the "contemplated benefit" of the illegal scheme was, at most, an increase of $3 to $5 per share. Under this reasoning, the 300,000 shares should have been multiplied by a $2 increase per share, for a total loss of $600,000, yielding only a 10–level

increase pursuant to U.S.S.G. § 2F1.1(b)(1)(K).

By the time of Pignatiello's sentencing, the government had conceded that Mazzeo was not a participant in the criminal scheme and that he "did not engage in any criminal activity with regard to the Spaceplex stock." Nonetheless, the government contended that the price of Spaceplex stock should be measured starting from a price of $2 per share, because the increase from $2 to $3 per share resulted from actions Mazzeo had taken pursuant to Pignatiello's instructions and was specifically intended by defendants as an integral step in the larger scheme to raise the price as high as $10 per share. The district court adopted the government's position, reasoning that "the record fully supports the computation reflected in the presentence report" and that "we are dealing ... not with mathematical precision, but [with] what was intended and what was expected ... with respect to the stock of Spaceplex."

On appeal, Pignatiello asserts the district court's loss calculation was in error, and Fasano incorporates this argument by reference.

## DISCUSSION

### I Standard of Review

"On appeal from a sentence, we uphold the sentencing court's factual findings unless they are clearly erroneous, and review its legal determinations *de novo*, while giving due deference to its application of the Sentencing Guidelines to the facts." *United States v. Berg*, 250 F.3d 139, 142 (2d Cir.2001). Although the computation of the loss is a question of fact reviewed for clear error, the meaning of "loss" as the term is used in the Sentencing Guidelines is a legal question that is reviewed *de novo*. *United States v. Mucciante*, 21 F.3d 1228, 1237 (2d Cir.1994).

Since Fasano failed to raise his objection to the loss calculation before the district court, we may vacate his sentence only if its imposition was the result of a plain error affecting substantial rights. *See* Fed.R.Crim.P. 52(b); *United States v. Caban*, 173 F.3d 89, 92 (2d Cir.1999). Inasmuch as we ultimately find no error in the trial court's loss calculation, we need not undertake a separate plain-error analysis in order to rule on Fasano's challenge to that calculation. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("The first limitation on appellate authority under Rule 52(b) is that there indeed be an 'error.' "); *United States v. Gitten*, 231 F.3d 77, 79 (2d Cir. 2000).

### II Loss Calculation

#### A. General Principles

Because Fasano and Pignatiello were sentenced in December 1999 and January 2000, we turn to the 1998 version of the Sentencing Guidelines then in effect (no 1999 version having been issued) for guidance in reviewing the loss calculation. *See United States v. Karro*, 257 F.3d 112, 120 & n. 2 (2d Cir.2001); *Gitten*, 231 F.3d at 79.

The 1998 Sentencing Guidelines set forth a base offense level of six for offenses involving fraud or deceit, and provide for an increase in the base offense level "[i]f the loss exceeded $2,000." U.S.S.G. § 2F1.1(a), (b)(1). This increase ranges anywhere from one level, if the loss was more than $2,000 but not more than $5,000, up to 18 levels, if the loss was more than $80 million. *Id.* § 2F1.1(b)(1)(B)-(S). Implicated here are the 11-level increase for a loss of $900,000 that the district court imposed, and alternatively, the 10-level in-

crease for a loss of $600,000 that appellants seek. *See id.* § 2F1.1(b)(1)(K), (L).

The Commentary to the Sentencing Guidelines explains that "[a]s in theft cases, loss is the value of the money, property, or services unlawfully taken." *Id.* § 2F1.1, cmt. n. 8 (citing U.S.S.G. § 2B1.1, cmt. n. 2); *see also id.* § 2F1.1, cmt. n. 8(a) ("Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.*, $30,000)."). Consistent with the provisions applicable to conspiracy cases, the Commentary states that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." *Id.* § 2F1.1, cmt. n. 8 (citing U.S.S.G. § 2X1.1). The Commentary elaborates

> For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

*Id.* § 2F1.1, cmt. n. 9; *see also United States v. Pedragh*, 225 F.3d 240, 243–45 (2d Cir.2000) (explaining role of Commentary in interpretation of Sentencing Guidelines).

### B. *The Present Dispute*

Although appellants first challenge as excessive the district court's factual finding that 300,000 shares were at stake, we see no clear error in that finding. The record contains ample evidence of the 47,000 shares that the undercover agent was to sell (40,000 represented by the certificate delivered by Fasano plus 7000 of the shares held by Mazzeo), an additional 50,000 shares issued to Fasano's brother that remained under Fasano's control, and 207,000 to 227,000 shares that had been issued or were to be issued to Manas and another Spaceplex officer. Hence, the total number of shares at stake exceeds 300,000.

Appellants do not contest that: (1) their intended gain is an appropriate proxy for estimating loss; (2) the intended increase in the price of Spaceplex stock (multiplied by the number of shares at stake) is an appropriate gauge of the intended gain; or (3) $5 per share is a reasonable upper limit for estimating the intended increase in the Spaceplex stock price. Thus, the only question remaining is whether the sentencing court correctly set the bottom benchmark at $2 rather than $3 per share in estimating the intended increase in the Spaceplex stock price. As noted above, Pignatiello challenges the $2 benchmark on the rationale that the undercover agent had been directed not to commence the fraudulent sales of Spaceplex shares to his customers until Peter Mazzeo had pushed the price up to $3 per share. Pignatiello's appeal thus raises the question whether the term "loss" as used in U.S.S.G. § 2F1.1(b)(1) may properly include an amount attributable to what the government concedes was lawful conduct on the part of Mazzeo. Neither appellants nor the government has cited any authority directly on point that would resolve this question and we have found none ourselves.

#### 1. The *Carrozzella* Decision

Nevertheless, we find helpful guidance on this issue from our decision in *United*

*States v. Carrozzella,* 105 F.3d 796, 802–04 (2d Cir.1997), *rejected as dicta on other grounds by United States v. Kennedy,* 233 F.3d 157, 160 (2d Cir.2000). There we addressed an increase in the base offense level premised on the defendant's leadership "of a criminal activity that involved five or more participants or was otherwise extensive," pursuant to U.S.S.G. § 3B1.1(a). *Carrozzella,* 105 F.3d at 802. Under that provision of the Sentencing Guidelines, unknowing or unwitting participants in a criminal scheme may not be counted in ascertaining whether the scheme "involved five or more participants," but they may be counted in ascertaining whether it was "otherwise extensive." *Id.; accord United States v. Paccione,* 202 F.3d 622, 624 (2d Cir.2000) (per curiam). The question presented in *Carrozzella* was how to count such unknowing participants under the latter prong. 105 F.3d at 802.

To resolve this question, we interpreted the "otherwise extensive" prong as asking whether the criminal scheme was the "functional equivalent" of a scheme involving five or more knowing participants. *Id.* at 803. We stated that in determining functional equivalence, a sentencing court must consider the following

> (i) the number of knowing participants;
>
> (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent;
>
> (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*Id.* at 803–04; *accord United States v. Wilson,* 240 F.3d 39, 47–50 (D.C.Cir.2001) (adopting *Carrozzella* standard); *United States v. Helbling,* 209 F.3d 226, 244–48 (3d Cir.2000) (same). We further ex-

plained that the third factor requires an examination of "the nature of the services provided," and that "[l]awful services that are not peculiarly tailored and necessary to a particular crime but are fungible with others generally available to the public are not the functional equivalent of knowing participation." *Carrozzella,* 105 F.3d at 804.

■ Significantly, for purposes of resolving the issue before us today, the decision in *Carrozzella* suggests that in certain instances in the calculation of a criminal sentence, a defendant may be held responsible for the lawful activities of unwitting participants in the criminal scheme. The last quoted statement in particular seems to confirm this point. Admittedly, the word "[l]awful" as used in that statement might be read as a limitation on the types of conduct that are embraced by U.S.S.G. § 3B1.1(a). But if that were the case, then one would expect the same word to appear as a qualifier in the decision's three-prong test. It does not, and so the import of the quoted passage must mean that lawful services fall within U.S.S.G. § 3B1.1(a) when "peculiarly tailored and necessary to a particular crime" but not when "fungible with others generally available to the public." In fact, subsequent case law has applied the *Carrozzella* test in precisely this fashion. *See, e.g., United States v. Napoli,* 179 F.3d 1, 13–15 (2d Cir.1999) (finding "loss" properly included amounts resulting from actions of unwitting casino employees in processing transactions requested in furtherance of defendant's money laundering scheme); *United States v. Nolan,* 136 F.3d 265, 272–73 (2d Cir.1998) (approving sentencing court's consideration of unwitting accountants, bank officers, and lawyers used to perpetuate embezzlement scheme).

### 2. Application

■ The troubling aspect of this case is that the government concedes that Mazzeo

acted legally yet the defendants' sentences were enhanced on account of that conduct. However, the defendants' control over Mazzeo and their intentions with respect to his activities convince us that the sentencing court did not err. By analogy to *Carrozzella*, we think the rule is that a defendant may be held responsible under U.S.S.G. § 2F1.1(b)(1) for the losses incurred by the lawful activities of an unwitting participant in the criminal scheme where (1) the activities were organized or led by the defendant with specific criminal intent, (2) the services of the unknowing participant were peculiar and necessary to the criminal scheme, and (3) these services were not fungible with others generally available to the public.

In the ordinary case, this rule relieves the sentencing court of the onerous task of ferreting out losses that may have been caused by the otherwise lawful acts of unwitting participants in the criminal scheme. Adopting such a rule has the additional advantage of construing the relevant Sentencing Guidelines as coherent with one another. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (explaining that a statute must be interpreted "as a symmetrical and coherent regulatory scheme," and "fit, if possible, all parts into an harmonious whole," recognizing that the meaning of one statute may be affected by others); *United States v. Kirvan*, 86 F.3d 309, 311–15 (2d Cir.1996) (construing Sentencing Guidelines "as if they were a statute"); *see also Carrozzella*, 105 F.3d at 802–03 (noting that U.S.S.G. §§ 3B1.1(a) and 2F1.1 play complementary roles in increasing sentences based on "head counting" and loss, respectively).

When this principle is applied in the present case, we see no error in the trial court's including in the loss calculation the increase from $2 to $3 per share in the Spaceplex stock price attributable to Mazzeo's lawful conduct. Although the district court made no formal, particularized findings, it specifically noted that Pignatiello had orchestrated the entire scheme, of which Mazzeo's activities were a part, and it further acknowledged that the purpose of the stock manipulation was to help raise the price per share to a level that would permit a secondary public offering at a profit to the conspirators. Moreover, in adopting the $2 benchmark price, the trial court reasoned that the increase in stock price to $3 per share that Mazzeo generated was what the defendants intended and expected with respect to the Spaceplex stock.

We have recognized that particularized findings are unnecessary where the sentencing court speaks generally to the pertinent considerations and the specific facts are apparent from the record. *United States v. Chacko*, 169 F.3d 140, 150–51 (2d Cir.1999); *accord Napoli*, 179 F.3d at 14–15; *United States v. Spencer*, 129 F.3d 246, 253–54 (2d Cir.1997). Here, neither appellants nor the government disputes it was Mazzeo's market-making activities that caused the price of Spaceplex stock to rise from $2 to $3 per share. As the record readily demonstrates, it was Mazzeo's specific act of posting a record high bid of $2.50 per share on January 5, 1996 that provided the initial impetus for the price increase, and it was Mazzeo's subsequent trades of Spaceplex stock, all undertaken at Pignatiello's direction, that caused the price eventually to rise to $3 per share.

As a consequence, we conclude that, with respect to the amounts attributable to Mazzeo's lawful conduct, the district court's loss calculation was indeed "a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 cmt. n. 9.

CONCLUSION

Accordingly, for the reasons set out above, we affirm the district court's loss calculation and the sentences imposed on defendants that resulted from it. Because we have resolved all other issues on this appeal in the summary order filed separately herewith, the judgments of conviction are hereby affirmed.